UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

JODY LEE BEACH and
RHONDA B. BEACH,                                      Case no. 21-10762-t13

        Debtors.

## OPINION

Before the Court is whether to confirm Debtors' chapter 13 plan. The plan drew two objections, one from the chapter 13 trustee and one from Iron Horse Welding, LLC ("Iron Horse"). Debtors resolved their differences with the trustee before the final hearing, leaving Iron Horse's objection. Having held an evidentiary hearing and considered the arguments of counsel, the Court finds that the plan should be confirmed and Iron Horse's objection overruled, with one exception about a deduction for life insurance premiums.

A.     Facts.[1]

       The Court finds:[2]

Debtors Jody and Rhonda Beach filed this case on June 18, 2021. The filing was prompted by a $325,000 judgment against Jody obtained by Iron Horse in one of the two state court actions it brought against him.[3] The Beaches used to work for Iron Horse. The relationship between the Beaches and Iron Horse was mutually beneficial and profitable for a number of years; the Beaches and Iron Horse's owner, Allan Grisham, were good friends. The relationship ended very badly,

---

[1] The Court takes judicial notice of the docket in this case. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may sua sponte take judicial notice of its docket and of facts that are part of public records).
[2] Some of the Court's findings are in the discussion section of the opinion. They are incorporated by this reference.
[3] This case was filed before the judge ruled in the other state court action.

however. Debtors filed this chapter 13 case to stop collection of and to discharge the judgment debt.

Litigation in this case has been significant. Iron Horse filed a motion to dismiss the case, alleging that Debtors had too much unsecured debt. The outcome of the hearing depended on the value of Debtors' house. The Court held a final hearing on valuation and related matters, found a value for the house, and denied the motion to dismiss. In addition, Iron Horse also filed two adversary proceedings seeking nondischargeability determinations. Iron Horse dismissed the first proceeding after Debtors filed a motion for summary judgment. The other proceeding was tried over three days. The Court recently entered a final judgment for Debtors in that proceeding. Iron Horse has appealed the judgment. Finally, Iron Horse litigated confirmation of Debtors' chapter 13 plan.

Debtors filed their Third Amended Chapter 13 Plan on July 28, 2022 (the "Plan"). It is a 60-month plan that proposes to pay $166,095 to creditors. The proposed monthly plan payments average $2,768.25. Debtors are current on the plan payments.

Debtors own a 2018 GMC Sierra 3500 pickup truck and a 2018 Shasta Phoenix 5th wheel trailer, both financed by Mountain America Credit Union. The loans are cross-collateralized. It appears that the truck is worth about $16,000 more than its purchase-money loan balance, while the 5th wheel is worth about $20,000 less than its purchase money loan balance. The Plan proposes that Debtors would make regular monthly payments on both loans "outside" the plan. The truck should be paid off in May 2024. The regular monthly truck loan payment is $816.96, while the 5th wheel loan payment is $444.75.

Debtors also own a 2013 Harley Davidson FLHXI, free and clear. Jody valued the Harley at $6,500. Iron Horse contends it is worth more, but did not introduce any evidence of value.

-2-
Case 21-10762-t13    Doc 143    Filed 11/08/22    Entered 11/08/22 16:01:43 Page 2 of 16

Debtors propose to keep the motorcycle. They claimed an exemption for it, to which no objection was filed.

On March 7, 2022, Debtors filed an amended Form 122C-2.[4] The amended form shows current monthly income of $14,633.50 and total deductions of $12,270.60, resulting in net monthly disposable income of $2,362.90.

Finally, Debtors filed amended schedules I and J on June 20, 2022. The schedules show monthly income after payroll deductions of $11,170.25 and monthly expenses of $9,568.14, resulting in net amount available to pay creditors of $1,602.11.

The chapter 13 trustee (the "Trustee") objected to confirmation of the Plan. She argues:

- The $230 in additional home energy costs claimed by Debtors in the Form 122C-2, line 28, should be reduced by $190/month;
- The $100/month expense for optional telephone services, claimed on line 23 of Form 122C-2, is not justified;
- Debtors' state in their Plan that the minimum they must pay general unsecured claims is $7,498.44. That is incorrect; the accurate figure is $141,177;
- The proposed monthly plan payment is too low;
- Any bonuses paid postpetition should be paid to the Trustee; and
- The proposed plan payments are insufficient to pay all allowed claims.

Iron Horse also objected to Plan confirmation (the "Iron Horse Objection"), as follows:

- The plan was filed in bad faith;
- The proposal to pay Iron Horse's secured claim directly is improper;
- Debtors should not be allowed to keep their pickup truck;
- Debtors should not be allowed to keep their motorcycle;
- Debtors should not be allowed to keep their 5th wheel trailer;
- The motorcycle is undervalued;
- Debtors should increase their plan payments after the truck is paid off;
- The proposed interest rate on Iron Horse's secured claim (4%) is too low;
- Debtors should be required to pay all net bonuses into the plan;
- Debtors' monthly life insurance premium payment of $413.62 is too high;
- Debtors' deduction of $230 in additional home energy costs is excessive;
- Debtors' $44 deduction for additional food and clothing expense is excessive; and

---

[4] Form 122C is in two parts. 122C-1 calculates debtor's current monthly income, while 122C-2 calculates debtor's allowed monthly expenses.

- Debtors' $200 deduction to "catch up on 401k" is excessive.

The Trustee settled with Debtors before the confirmation hearing. The Court was not provided with particularly good evidence of the settlement terms. However, the Plan provides for total payments of $166,095, while a "Chapter 13 Plan Summary Report," which is part of the record, discloses total payments of $233,638 (an average monthly payment of $3,893.97). The extra $67,543, or an extra $1,125.72 per month, is a key settlement term, . Under the settlement, the average plan payment , increasing the average monthly plan payment from . According to Jody's testimony, Debtors agreed to give any net bonuses and tax refunds to the Trustee, up to $20,000. The balance of the extra money, $47,543, appears to be, in part, a settlement of the Trustee's objections to Debtors' home energy and cell phone deductions. The Court therefore finds that $17,400 of the increased monthly plan payments represents a $190/month reduction in the additional home energy cost deduction and the elimination of the $100/month cell phone expense deduction.

B. Calculating Debtors' "Projected Disposable Income."

Because Iron Horse holds an allowed unsecured claim and objected to confirmation of the Plan, the Court may not confirm it unless the Plan provides that all of Debtors' "projected disposable income to be received in the applicable commitment period . . . will be applied to make payments to unsecured creditors under the plan." § 1325(b)(1). To determine whether the Plan does so, the Court must calculate Debtors' "current monthly income" and subtract from that the "amounts reasonably necessary to be expended." § 1325(b)(2).

1. Current monthly income. Section 101(10A) provides in part that "current monthly income"

> (A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on--
>   (i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or
>   (ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and
> (B)(i) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent) [.]

Form 122C-1 calculates "current monthly income" in accordance with § 101(10A).

Although § 101(10A) defines current monthly income rigidly, the Supreme Court held in *Hamilton v. Lanning*, 560 U.S. 505 (2010), that, for chapter 13 plan confirmation purposes, bankruptcy courts may sometimes deviate from the "mechanical" calculation to account for changes in the debtor's income. In *Lanning*, the debtor received a large, one-time bonus within six months of her bankruptcy filing. Because of the bonus, her "current monthly income" under § 101(10A) was substantially higher than her actual postpetition income. The Supreme Court held:

> Consistent with the text of § 1325 and pre-BAPCPA practice, we hold that when a bankruptcy court calculates a debtor's projected disposable income, the court may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation.

560 U.S. at 524.

Both the Trustee and Iron Horse wanted any bonuses paid to Debtors during the commitment period to be turned over to the Trustee. Whether anticipated bonuses can or should be treated as part of a debtor's projected disposable income has been debated. *Compare, e.g., In re Styerwalt*, 610 B.R. 356, 364-65 (Bankr. D. Colo. 2019) (bonuses should not be included), *with In re Rivera*, 2020 WL 7333588, at *2 (Bankr. M.D. Fla.) (bonuses should be included). This issue

is not before the Court, however, because the settlement between Debtors and the Trustee includes how to handle bonuses paid during the commitment period.

Per their amended Form 122C-1, Debtor's "current monthly income" for confirmation purposes is $14,633.50. Iron Horse did not take exception to this amount.

2. <u>Calculation of Amounts "Reasonably Necessary to Be Expended."</u> The Court must deduct from Debtor's current monthly income all "amounts reasonably necessary to be expended." § 1325(b)(2). As outlined in a recent case:

> The calculation of "amounts reasonably necessary to be expended" is based, in part, on the size of a debtor's "household." § 1325(b)(3). A court must compare the debtor's income to the "highest median family income of the applicable State" for the household size. *Id.* If the debtor's income is higher than that number, then § 707 (b)(2)(A)-(B) provides which expenses are allowed. If the debtor's income is lower than that number, the debtor's actual expenses are used.

*In re Poole*, 2022 WL 5224087, at *2 (Bankr. N.D. Tex.). Section 1325(b)(3) provides:

> Amounts reasonably necessary to be expended under paragraph (2) . . . shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if the debtor has current monthly income, when multiplied by 12, greater than--
> . . .
>   (B) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals [.]

In their Form 122C-1 Debtors calculated their "current monthly income for the year" as $175,602. The median annual income for a household of two in New Mexico is $58,003, so Debtors are well "above median." Because of that, the "amounts reasonably necessary to be expended" are determined in accordance with § 707(b). § 1325(b)(3).

3. <u>Debtors' "reasonably necessary" expenses under § 707(b)</u>. The expenses to be deducted from "current monthly income" to determine Debtor's "projected monthly income" are set out in § 707(b)(2)(A) and (B) and can be found in Form 122C-2.[5] The means test's formulaic,

---
[5] The process of calculating "current monthly income" pursuant to § 101(10A) and subtracting

standardized approach to determining a debtor's reasonable expenses clearly is what Congress intended when it passed the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). *See, e.g., Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 64 (2011) (pre-BAPCPA "practice of calculating debtors' reasonable expenses on a case-by-case basis led to varying and often inconsistent determinations").

There are exceptions to a purely mechanical application of the means test, however. First, as held in *Lanning*, "the court may account for changes in the debtor's income *or expenses* that are known or virtually certain at the time of confirmation." 560 U.S. at 524 (italics added). Thus, if a debtor does not have an expense at the time of confirmation that she had on the petition date, and if the expense was deductible on the means test, an adjustment would be appropriate.

In addition, in *Ransom* the Supreme Court ruled that if a debtor does not have an expense of the type provided for in the means test, he may not take the deduction. In *Ransom*, the debtor owned his car free and clear of liens. The means test has a deduction for vehicle loans (denoted "Ownership Costs" in the Form 122C-2 in use when Ransom filed his chapter 13 case). Debtor claimed the deduction and a creditor objected. The Supreme Court held:

> Based on BAPCPA's text, context, and purpose, we hold that the Local Standard expense amount for transportation "Ownership Costs" is not "applicable" to a debtor who will not incur any such costs during his bankruptcy plan. Because the "Ownership Costs" category covers only loan and lease payments and because Ransom owns his car free from any debt or obligation, he may not claim the allowance. In short, Ransom may not deduct loan or lease expenses when he does not have any.

*Ransom*, 562 U.S. at 80. The Supreme Court overruled debtor's argument that, under its interpretation of the means test, "[d]ebtors can time their bankruptcy filing to take place while they

---

monthly expenses derived in accordance with § 707(b)(2)(A)(ii) is known as the "means test." *See, e.g.*, § 707(2)(B)(iv)(D).

still have a few car payments left, thus retaining an ownership deduction which they would lose if they filed just after making their last payment." *Id.* at 78. The Supreme Court responded:

> But this kind of oddity is the inevitable result of a standardized formula like the means test, even more under Ransom's reading than under ours. Such formulas are by their nature over- and under-inclusive. In eliminating the pre-BAPCPA case-by-case adjudication of above-median-income debtors' expenses, on the ground that it leant itself to abuse, Congress chose to tolerate the occasional peculiarity that a brighter-line test produces. . . . [Furthermore] creditors may well be able to remedy Ransom's "one payment left" problem. If car payments cease during the life of the plan, just as if other financial circumstances change, an unsecured creditor may move to modify the plan to increase the amount the debtor must repay. See 11 U.S.C. § 1329(a)(1).

562 U.S. at 78-79. For cases applying *Ransom*, *see, e.g., In re Moore*, 482 B.R. 248, 256 (Bankr. C.D. Ill. 2012) (adjustment should be made if a car loan is paid off before plan confirmation); *In re Montiho*, 466 B.R. 539, 541-42 (Bankr. Haw. 2012) (because car loans would be paid within three months, it would "surely happen" so expense calculation should be adjusted accordingly); *see also In re Blumer*, 453 B.R. 429, 432 (Bankr. D. Kan. 2011) (debtors could not deduct two mortgage note payments because they surrendered the house and were not going to make the payments); *In re Gnaman*, 2022 WL 1038164, at *5 (Bankr. D. Mass.) (debtor could not deduct cure payments on mortgage if those payments would not actually be made); *see generally In re Liehr,* 439 B.R. 179, 187 (10th Cir. BAP 2010) (in a pre-*Ransom* decision, the Tenth Circuit BAP held that a debtor could not deduct payments on debt secured by a house she was surrendering).

C.   <u>The Iron Horse Objection</u>.

At the final confirmation hearing, Iron Horse's argument and evidence did not correlate very well to its Objection. Rather, Iron Horse argued that the following monthly expenses on Debtors' amended schedule J were excessive:

- Debtors' utility expenses of $523;
- The $35 car wash expense;
- The $150 expense for clothing, laundry, and dry cleaning;

- The $1,000 expense for food;
- The life insurance expense of $317;
- The $645.84 expense for 401k contributions;
- The cell phone expense;
- The $444 payment on the 5th wheel loan; and
- The $816 payment on the truck loan.

As the law discussed above makes clear, schedule J expenses are not relevant to whether above-median debtors are paying their projected disposable income to their creditors. *See, e.g., In re Edmondson*, 363 B.R. 212, 218 (Bankr. D.N.M. 2007) (for above-median debtors, their actual expenses as reported on Schedule J should not be used). Instead, the Court must decide whether Debtors' "current monthly income" and "means test" calculations were done correctly, with the potential modifications allowed by *Lanning* and *Ransom*. The Court addresses the Iron Horse Objection in that light.

Car wash expense. Iron Horse's argument that the $35/month car wash expense is excessive must be overruled, as the expense does not appear in Form 122C-2.

Clothing, laundry, and dry cleaning expense. Similarly, the $150/month clothing, laundry, and dry cleaning expense is on Schedule J but not Form 122C-2. Thus, Iron Horse's argument that the expense is excessive misses the mark.

401k contributions. In its Objection, Iron Horse objected to a $200/month deduction for "catch-up" 401k contributions.[6] The Court overrules the objection and finds that the proposed

---

[6] At the final hearing, Iron Horse objected to the $645.84 of 401k contributions shown on Debtors' amended Schedule I. Those contributions do not appear in Debtors' amended Form 122C, so the argument is not relevant.

contribution modest and reasonable, and allowed by § 541(b)(7).[7] Debtors are about 50 and have little retirement savings. $200 per month for retirement at their age is not excessive.

Additional Home Energy Costs. Iron Horse, like the Trustee, objected to Debtors' $230 deduction for additional home energy costs. The Court has found that, in settling with the Trustee, Debtors agreed to reduce this deduction from $230 to $40. The Court finds that a $40 deduction for additional home energy costs is reasonable, so Iron Horse's objection, to the extent not resolved by the $190/month reduction, is overruled.

Cell Phone Expense. The Iron Horse Objection did not address a monthly cell phone expense. Instead, the Objection asserted that some of Debtors' cell phones may be owned by Iron Horse. At the final hearing, in contrast, Iron Horse argued that Debtors should reduce their cell phone expense. This issue was resolved by the settlement with the Trustee, under which the $100/month deduction on line 23 of Form 122C-2 was deleted. Debtors now claim no separate deduction for cell phones, only the general deduction in line 8 for "Housing and utilities-insurance and operating expenses."

Additional food and clothing expense. The Iron Horse Objection to the $44/month in additional food and clothing deduction is not well taken and will be overruled. Debtors' explanations about their food and clothing budget were reasonable, and $44/month is *de minimus*. Iron Horse's arguments at the final hearing about Debtors' schedule J $1,000 food expense on line 7 is not relevant. Furthermore, Debtors' combined schedule J expenses for food (line 7) and

---

[7] A "hanging paragraph" after § 541(b)(7)(A) and (B) provides that 401k contributions "shall not constitute disposable income as defined in section 1325(b)(2)." There is a split in the case law about what the hanging paragraph means and whether, and/or to what extent, 401k contributions can be deducted from "projected disposable income" in chapter 13. For a good discussion of this complex issue, *see In re Huston*, 635 B.R. 164, 170-79 (Bankr. N.D. Ill. 2021). Due to patent reasonableness of the $200/month deduction, the Court need not wade into the controversy.

clothing (line 9) is $1,150/month. The IRS guideline for food and clothing in Form 122C-2, line 7, is $1,292/month. The schedule J expenses are reasonable.

<u>Monthly payments on the truck and 5th wheel loans</u>. Iron Horse's objection to the monthly payments on the pickup truck and 5th wheel trailer loans must be overruled. The means test allows deductions for all secured debt payments. *See* § 707(b)(2)(A)(iii)(I). It does not give the Court discretion to order that some secured debts not be paid or that certain collateral be surrendered. 6 Collier on Bankruptcy ¶ 707.04[3][c][ii] (16th ed) opines:

> Nor should the fact that the debtor has high mortgage payments, significantly in excess of the applicable Internal Revenue Service housing expense allowance, be a factor in determining whether abuse exists. The means test was carefully constructed to ensure that debtors continued to pay secured claims and paid priority unsecured claims before devoting income to general unsecured creditors. Courts should reject arguments that debtors should be required to move from more expensive homes and default on their mortgages in order to provide chapter 13 distributions to unsecured creditors. Requiring such a result would stand the means test on its head and prefer the interests of unsecured creditors over those of secured creditors.

Cases construing § 707(b)(2)(A)(iii)(I) generally hold that the means test does not grant bankruptcy courts discretion to determine that certain secured debts are excessive and should not be allowed. *See, e.g., In re Kapua,* 2020 WL 7345740, at *3 (Bankr. S.D. Ala.) (court overruled the chapter 13 trustee's objection to confirming a plan where debtor kept a car with monthly payment significantly higher than the IRS standard allowance); *In re Plichta*, 589 B.R. 794, 802 (Bankr. N.D. Ill. 2018) (quoting Collier, the court stated that the "plain language literally requires that all payments contractually due to secured creditors during the relevant period be deducted"); and *In re Colon*, 561 B.R. 682, 685 (Bankr. N.D. Ill. 2016) (listing debtor's camper debt is proper under §707(b)(2)(A)(iii)(I); there is no "reasonably necessary" standard). There is a minority view. *See, e.g.*, *In re Fields*, 534 B.R. 126, 137 (Bankr. E.D.N.C. 2015) (court has discretion to determine the necessity of any collateral for which a debtor will make a secured debt payment through the

Case 21-10762-t13    Doc 143    Filed 11/08/22    Entered 11/08/22 16:01:43 Page 11 of 16

plan). The Court holds that, post-BAPCPA, it has no discretion to determine what secured debts are "reasonably necessary" for above-median debtors. Rather, the Court's ability to prevent abuse is to deny plan confirmation on "bad faith" grounds. *See* § 1325(a)(3) and (7); *In re Hylton*, 374 B.R. 579, 586 (Bankr. W.D. Va. 2007) (proposal of above-median debtor to retain a pleasure boat is subject to the good faith test); and *In re Sandberg*, 433 B.R. 837, 846 (Bankr. D. Kan. 2010) (denying confirmation on good faith grounds where debtors proposed to retain 36-foot cabin cruiser). Good faith is discussed below.

Furthermore, the trial evidence shows that keeping the pickup truck, the 5th wheel, and the motorcycle is not unduly extravagant. The truck is six years old and will be paid off in 18 months. The interest rate on the truck loan is favorable—4.74%. The combined payments on the truck and 5th wheel are $1,260, to be reduced to $444 in 18 months. If Debtors were to surrender the truck, 5th wheel, and motorcycle and buy two cars,[8] how much would they save per month? What interest rate would they be charged? Where would they get the down payments? Iron Horse did not introduce any evidence that would allow the Court to make a finding of substantial, or even any, savings if Debtors surrendered the truck and 5th wheel. On the contrary, the evidence indicates that the more prudent course is for Debtors to keep the truck and the 5th wheel, pay off the truck loan as agreed, and have an extra $816 per month thereafter.

<u>Adding the truck loan payment amount to the Plan</u>. Iron Horse next argues that once Debtors pay off the truck loan, the loan payment amount should be devoted to the plan. The Court holds that it is too soon to find that the loan payoff is "virtually certain" to occur, which is what *Lanning* requires. *See, e.g., Moore*, 482 B.R. at 255 (car loan with 58 months left to pay may or

---

[8] It would be reasonable for Debtors to own two cars, as they both work. Iron Horse alleged in its objection that Jody's employer provides him a car, but there is nothing in the record supporting the allegation. In any event, it would be reasonable for Jody to have his own car.

may not get paid off; clearly there is no virtual certainty). The objection therefore is overruled. As suggested by Justice Kagan in *Ransom*, 562 U.S. at 79, however, the Trustee or Iron Horse could file a motion to modify the Plan if and when the truck loan is paid off. The Court does not rule on the outcome of such a motion.

<u>Life insurance premiums</u>. Iron Horse's objection concerning life insurance payments is well taken. The trial evidence showed that Jody's life insurance policy is not a term policy but more like a "whole life" policy. Form 122C-2, line 18, allows deductions only for term life insurance premiums. Debtors took a $317 deduction. The confirmation order to be submitted by the Trustee should adjust the life insurance policy deduction to the cost of term policies on Jody's and Rhonda's lives, at the current policy amounts.

H.  <u>Good Faith</u>.

The Court will address whether the Plan was filed in good faith, as the issue was raised in the Iron Horse Objection (although not argued at the final hearing) and is, in any event, a significant confirmation requirement. *See* § 1325(3). In *Flygare v. Boulden*, 709 F.2d 1344, 1347-48 (10th Cir. 1983), the Tenth Circuit adopted an eleven-factor test to determine whether a chapter 13 plan has been proposed in good faith: (1) the amount of the proposed payments and the amount of the debtor's surplus; (2) the debtor's employment history, ability to earn and likelihood of future increases in income; (3) the probable or expected duration of the plan; (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court; (5) the extent of preferential treatment between classes of creditors; (6) the extent to which secured claims are modified; (7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in chapter 7; (8) the existence of special circumstances such as inordinate medical expenses; (9) the frequency with

which the debtor has sought relief; (10) the motivation and sincerity of the debtor in seeking chapter 13 relief; and (11) the burden which the plan's administration would place upon the trustee. The *Flygare* factors apply post-BAPCPA. *E.g., In re Stuteville*, 2020 WL 6368890, at *9 (Bankr. D.N.M.); *Sandberg*, 433 B.R. at 841-42. The Court weighs the *Flygare* factors:

| Factor | Discussion |
| --- | --- |
| (1) The amount of the proposed payments and the amount of the debtor's surplus. | The Plan payments are substantial, averaging $3,893.97 per month. Total plan payments will be $233,638.06. |
| (2) The debtor's employment history, ability to earn and likelihood of future increases in income. | Debtors' employment history is good. There is a good chance Debtors will earn their current income or more during the Plan term. |
| (3) The probable or expected duration of the plan. | The Plan is a 60-month plan, the longest term allowable. |
| (4) The accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court. | As amended, the Plan's statements of debts, expenses, and percentage repayment of unsecured debt is accurate. |
| (5) The extent of preferential treatment between classes of creditors. | There is no preferential treatment between classes of creditors. |
| (6) The extent to which secured claims are modified. | No secured claims are modified. |
| (7) The type of debt sought to be discharged and whether any such debt is non-dischargeable in chapter 7. | Iron Horse's judgment could be nondischargeable in chapter 7, although no such determination has been made. |
| (8) The existence of special circumstances such as inordinate medical expenses. | Filing bankruptcy was the only way to stop Iron Horse's collection activity. |
| (9) The frequency with which the debtor has sought relief. | Debtors filed a chapter 7 case in this district in 2001. |
| (10) The motivation and sincerity of the debtor in seeking chapter 13 relief. | Debtors are motivated and sincere. They rightly saw a bankruptcy case was the only way to deal with Iron Horse's judgment. |
| (11) The burden which the plan's administration would place upon the trustee. | Administration of the Plan would not place undue burden on the Trustee. |

All the factors weigh in favor of a good faith finding. Iron Horse obtained a large judgment against Jody. He could not pay it, and his wages and bank account were being garnished. The debt is dischargeable in chapter 13. Debtors therefore elected to file this case, a decision that is hard to criticize.

It should be noted that the Plan would have paid a substantial dividend to general unsecured creditors but for Iron Horse's decision to litigate this case so heavily. A typical chapter 13 case in this district costs about $5,000 in attorney fees. Iron Horse has forced Debtors to spend ten times that amount. The extra $45,000 would have gone to unsecured creditors, including Iron Horse. It is not bad faith for Debtors to defend themselves.

I.        The Other Confirmation Requirements Have Been Met.

At the final confirmation hearing, Iron Horse limited its arguments to Debtor's expenses. Those have been addressed above. To the extent Iron Horse made other arguments in its Objection, e.g., that the proposed interest rate on its secured claim is too low and/or that the proposed direct payment of its secured claim is objectionable, the arguments have been waived and are overruled. The Court finds that all the § 1325(a) requirements have been satisfied.

J.        Other.

Two matters are potentially relevant to Debtor's projected disposable income and should be mentioned. Neither one drew an objection from the Trustee or Iron Horse, so the Court will not rule on them, nor deny or delay confirmation.

First, Debtors' amended Form 122C-2 added a deduction of $566.88/month for an alleged $34,013 prepetition arrearage on Debtors' home mortgage. This is confusing because the mortgage holder amended its proof of claim on November 9, 2021, to reduce the "cure amount" from $30,780.34 to $141.42.[9] The Plan proposes to pay the reduced cure amount. There may be an explanation why the $566.88 is a valid deduction. Alternatively, perhaps the matter was settled by the Trustee.

---

[9] The reduction was needed because Debtors were allowed to defer a number of mortgage payments due to COVID-19, but the deferrals were not reflected in the cure amount set out on the mortgage holder's original proof of claim.

Second, Debtors' amended schedule I reflects Rhonda's higher monthly salary from a new job (an increase of $1,200, from $4,425.53 to $5,625). The higher monthly salary was not reflected in Debtors' amended Form 122C-1.

Conclusion

Except for the objection related to life insurance, the Iron Horse Objection is overruled. The Court will enter a separate order consistent with this opinion.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: November 8, 2022
Copies to: counsel of record